IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| BUI THI BICH HONG; LE DANG ANH TUAN; TA THI KIM OANH; NGUYEN DUNG; NGUYEN NGOC KE; HOANG THU HOAI; HUONG THI VAN NGO; LIEN THI HUYNH LE; KHOI HONG LUONG; DO HUU MINH KHOA; LA LIEN THI KIM; PHAN HOANG TUAN; KHUONG ANH VAN; and TRUONG HOANG THANH TRUC, each a resident of the Socialist Republic of Vietnam and each individually and derivatively; | |
| Plaintiffs, | |
| v. | Civil Action No. _____ |
| MISSISSIPPI DEVELOPMENT REGIONAL CENTER, LLC, a Virginia Limited Liability Company; GBR, LP, a Virginia Limited Partnership; RED LEAF DEVELOPMENT, LLC, a Virginia Limited Liability Company; AMERICAN INTERNATIONAL & IMMIGRATION LAW GROUP, PC, d/b/a ROBERT LUBIN & ASSOCIATES, PC, a Virginia Professional Corporation; ROBERT LUBIN, an individual; PAUL RUBY, an individual; and ATLANTIC UNION BANCSHARES CORPORATION, a Virginia Corporation as successor to WashingtonFirst Bancshares Corporation; | **JURY TRIAL DEMANDED** |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs Bui Thi Bich Hong, Le Dang Anh Tuan, Ta Thi Kim Oanh, Nguyen Dung,

Nguyen Ngoc Ke, Hoang Thu Hoai, Huong Thi Van Ngo, Lien Thi Huynh Le,  Khoi Hong Luong,

Do Huu Minh Khoa, La Lien Thi Kim, Phan Hoang Tuan, Khuong Anh Van, and Truong Hoang

Thanh Truc, each a resident of the Socialist Republic of Vietnam (collectively "Plaintiffs"), by counsel, pursuant to Fed. R. Civ. P. 8, bring the following Complaint against Defendants Mississippi Development Regional Center, LLC, a Virginia Limited Liability Company ("MS RC"); GBR, LP, a Virginia Limited Partnership ("GBR"); Red Leaf Development, LLC, a Virginia Limited Liability Company ("RLD"); American International & Immigration Law Group, PC, d/b/a Robert Lubin & Associates, PC (f/k/a American International & Immigration Law Group, PLLC), a Virginia Professional Limited Liability Company ("AIIG"); Robert Lubin ("Lubin"), an individual residing in the Commonwealth of Virginia; Paul Ruby ("Ruby"), an individual now residing in the State of Tennessee; and Atlantic Union Bancshares Corporation, a Virginia Corporation as successor to WashingtonFirst Bancshares Corporation ("Escrow Bank"), and allege as follows:

## OVERVIEW OF ACTION

1.      The U.S. Immigrant Investor Program, colloquially referred to as the EB-5 Program, provides legal permanent residency in the United States to foreign nationals who invest in U.S.-based projects. See 8 U.S.C. §1153(b)(5)(A)ii.  Generally, qualified immigrants may gain U.S. visas through direct investment of at least $1 million in a new commercial enterprise that creates at least ten full-time jobs for U.S. workers. Id. § 1153(b)(5)(A) and (C). Investment in a business in a "targeted employment area" lowers the required capital investment amount to $500,000. Id. § 1153(b)(5)(C)(i) and (ii). Plaintiffs in this action invested $500,000 each in an enterprise in a "targeted employment area" in Gulfport, Mississippi (the "GBR Project" or "Project").

2.      The purpose of the GBR Project was to redevelop Centennial Plaza in Gulfport, to include renovation of an existing hotel and construction of a new, "boutique" hotel to attract tourist

and convention traffic.  As Defendant Lubin and AIIG knew when soliciting Plaintiffs to invest in it, the Project was doomed from the outset.  This action seeks an accounting and damages for the ill-conceived, irreconcilably conflicted placement of securities in the Project.  The GBR Project was promoted, validated, operated, managed, controlled and counseled by Defendants, each of whom is a resident of this District.

3.     Defendants had irreconcilable conflicts of interest that render the breached investment contracts at issue voidable under federal securities and laws and the common law of the Commonwealth of Virginia.  Lubin impermissibly assumed roles marketing, operating, maintaining and controlling the regional center and development entity of the GBR Project, marketing themselves as an efficient "one-stop shop" for EB-5 investors.  The entities controlled by these individuals enlisted a local bank to serve as escrow agent for the GBR Project to validate and offer financial credibility to their scheme.  Instead, Defendants were each a component of a one-stop shop for negligence, malfeasance, irreconcilable conflicts of interest and professional misconduct.  Plaintiffs seek justice from this Court to put them back where they started.  Plaintiffs request actual damages of at least $8.25 million, punitive and treble damages as permitted by the laws of the Commonwealth of Virginia, a full accounting of their misdirected invested funds, and the appointment of a Receiver over GBR.  Despite their collective investments and payment of fees totaling at least $8.25 million, not a single Plaintiff has received the promised EB-5 benefits.

## PARTIES

4.     Plaintiffs are 14 Vietnamese nationals who, between August 2016 - August 2017, each paid AIIG (then the law firm of Defendants Lubin and Ruby) a retainer to act as their respective immigration counsel and/or "source of funds counsel" for EB-5 visa benefits through investment in the GBR Project.  Plaintiffs are limited partners of GBR, which is an owner of equity

in the holding company of the GBR Project.

5.      RLD, which is controlled and owned by Defendant Lubin, serves as the General Partner for GBR.  Lubin is a principal and controlling person of AIIG, MDRC, and GBR through his ownership, dominion and control of RLD.

6.      AIIG was, until July 2019, the law firm of Defendants Lubin and Ruby that operated as partners from offices in Fairfax County, Virginia.   From July 2019 onward, Lubin has, on information and belief, served as the sole partner of AIIG.  MDRC is the EB-5 Regional Center that sponsored the GBR Project.  MDRC is controlled by Lubin through RLD and directly by Lubin himself.

7.      Lubin, Ruby, RLD, AIIG, MDRC and GBR through July 2019 are collectively the "Lubin Parties."  Ruby is *not* included among the Lubin Parties after July 2019.

8.      The Escrow Bank is a Virginia Corporation that previously operated as WashingtonFirst Bank.  The Escrow Bank served as the escrow agent for funds of Plaintiffs and other EB-5 investors, and as a matter of course validated the legality of the offering of the GBR Project.

9.      Virginia substantive law governs the relationship between Plaintiffs and all the Defendants, who are Virginia entities or citizens.   As applicable, Plaintiffs assert equitable tolling of statutes of limitation in this matter due to extraordinary circumstances.  As more fully described herein, two such extraordinary circumstances that have arisen in the past are (1) where fraud prevented the assertion of Plaintiffs' claims, or (2) where a defendant or any one of them 'has by affirmative act deprived the plaintiff of his power to assert his cause of action in due season.'  *See Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838-839, 840 (Va. 2008)

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

11.     This Court may permissibly exercise personal jurisdiction over all Defendants except Ruby, as they are all Virginia residents and subject to general personal jurisdiction.  Ruby is subject to personal jurisdiction pursuant to Va. Code § 8.01-328.1 as he has transacted business in the Commonwealth of Virginia out of which the claims in this suit arise.

12.     Venue is proper in the Eastern District of Virginia because a substantial part of the acts or omissions giving rise to the claim occurred in this District.

13.     To the extent Defendants argue that any arbitration or mediation provisions may apply to the disposition of Plaintiffs' claims against them, such provisions are ineffective given that the underlying contracts in which such clauses are contained, as more fully described herein, are void or are waived.

## STATEMENT OF FACTS

14.     Plaintiffs invested pursuant to the federal EB-5 Program, which is administered by USCIS. The EB-5 Program provides an opportunity for a foreign national to obtain legal permanent residency in the U.S. by investing, at all relevant times, $500,000 or $1,000,000 in a commercial enterprise that creates at least ten qualified full-time U.S. positions based on that investment.

15.     The EB-5 Program does not permit investments by EB-5 investors in the form of direct loans. EB-5 Regional Centers are organizations designated by USCIS to promote economic growth in a particular geographic region. When a foreign national invests in an EB-5 project

through a regional center, the job-creation requirement can be satisfied through a showing of indirect jobs created.

16.     EB-5 Regional Centers such as MDRC collect the investments of EB-5 investors into a pooled entity, which then loans the funds directly to the developer.  These pooled entities are typically structured as limited partnerships, with each of the EB-5 investors being limited partners. This structure provides the legal patina required to comply with the EB-5 Program's requirements while facilitating indirect investment by EB-5 investors into qualifying projects.

17.     After approval of the I-526 petition by USCIS, immigrant investors receive conditional permanent residence status for a period of two years. Before the filing of Form I-829, known as Petition by Entrepreneur to Remove Conditions on Permanent Resident Status, the EB-5 Regional Center is required to invest the immigrant's capital contribution in a job-creating commercial enterprise that creates at least ten qualified full-time positions in the United States, either directly or indirectly based on economic models.

18.     After an immigrant investor demonstrates to USCIS that his or her capital contribution was invested into a job-creating entity that produced at least ten qualified full-time jobs for U.S. workers based on the investment, the investor (and his or her immediate family) is granted U.S. lawful permanent residency through the filing and approval of an I-829 petition.

19.     The GBR Project consists of the redevelopment of Centennial Plaza in Gulfport, Mississippi, which was to include a Holiday Inn and another "boutique" hotel.

20.     Plaintiffs and other investors were offered a form of preferred equity in GBR, which in turn would use virtually all capital of its investors to invest in the GBR Project.  The invested funds would then be used to fund the construction of Centennial Plaza.

21.     The limited partners of the GBR Project sacrificed personally and financially to

collect their $500,000 investments for what they believed at the time was a reputable EB-5 Regional Center with the hope that they and their immediate families would qualify for EB-5 visas.

22.     Lubin and others at AIIG specifically targeted immigration agencies and investors in Vietnam to invest in projects sponsored by MDRC, including but not limited to the GBR Project. Using the documents prepared for a small EB-5 Project in Lake Geneva, Illinois in which Lubin was involved as a template, AIIG prepared offering documents for the GBR Project with the intent of enhancing the appearance of the financial stability of the GBR Project in the eyes of Plaintiffs and other investors.

23.     Included in marketing materials and offering documents for the GBR Project were representations and financial projections of state, federal and local government support, namely the provision of "tax credits" that would supposedly expedite the return of Plaintiffs' capital.  See Marketing Materials annexed hereto as ***Exhibit "1"*** and Return of Funds Strategy Flyer annexed hereto as ***Exhibit "2."***

24.     While the marketing materials and Return of Funds Strategy Flyer represented to Plaintiffs and other EB-5 Investors that profits from the operation of the GBR Project would ultimately pay them back, the fine print in Plaintiffs' offering memoranda (See ***Exhibit "3"*** annexed hereto) written by Lubin stated that such representations were likely empty promises:

> ***<u>Net proceeds realized</u> from the interest earned, sale, repayment or distribution of profit realized from the Limited Partnership's investments will be allocated and distributed 100% to the Limited Partners until each Limited Partner has received $500,000 in distributions plus a 0.5% Preferred Return based on their Capital Account valuation. Thereafter, the next $12,500,000 shall be distributed to the General Partner and after that, further distributions shall be allocated and distributed 99% to the General Partner and 1% to the Limited Partners pro rata (emphasis added).***

The truth was that just about anything that could be charged to the GBR Project, was charged by

its developer RLD, which was under the control of Lubin. RLD and thus Lubin was in fact the ultimate allocators of net profits, and not the GBR Project itself. Lubin's actual and inherent conflicts of interest in serving as immigration counsel or "source of funds counsel" for virtually every participant in the GBR Project prevented him from making accurate and complete disclosures as to financial and corporate governance matters and acting without conflicting out one or more of his clients.

25.     GBR also purported to have a full-fledged escrow process in place for the release of customer funds to the developer with whom it worked. However, as was well-known to Defendants, Lubin through AIIG generally controlled virtually every financial touchpoint of the deals in which he was involved. This is because Lubin had (1) direct or indirect ownership in, (2) de facto control over, (3) officer status and/or (4) an attorney/client relationship with each of GBR, MDRC, RLP and the GBR Project as their corporate, securities and/or immigration law counsel. AIIG even prepared the business plan for the GBR Project that was submitted to USCIS. See *Exhibit "4"* annexed hereto.

26.     Lubin's virtual control over the GBR Project at every turn presented irreconcilable conflicts of interest that could not be disclosed away by the swoop of a pen by either Lubin himself or the EB-5 investors he ultimately procured. Defendants in fact recognized the need to disclose away these conflicts through requiring each EB-5 investor in the GBR Project, including Plaintiffs, to sign a waiver form as part of their subscription agreement. *See Exhibit "5"* annexed hereto.

27.     Yet these irreconcilable conflicts did not prevent Lubin and AIIG from steering clear of further engagement in connection with the GBR Project. AIIG's attorneys, including but not limited to Lubin and Roy, also served as immigration counsel or "source of funds" counsel to Plaintiffs and required them to sign conflict waivers as well.

28.     The Escrow Bank was the last defense in preventing the Lubin Parties from injuring Plaintiffs.  Given their close, continued relationship with other ventures managed by Lubin and affiliates of AIIG, the Escrow Bank consciously chose to do nothing regarding the sea of "red flags" presented by Lubin's irreconcilable conflicts of interest in the GBR Project.  There was in fact no disclosure in the Escrow Agent Agreements of Plaintiffs stating that there were conflicts of interest between the Escrow Bank and the Lubin Parties by virtue of their continuous banking relationship.

29.     Defendants, and each of them, concealed the non-waivability of the subject conflicts of interest.  Given AIIG's role, and thus Lubin and Roy, in the GBR Project as attorneys on virtually every side of the deal, these conflicts were in fact not waivable at all under Virginia's applicable professional conduct rules.  Instead, Defendants placed and sold the GBR Project to Plaintiffs and dozens of others as a convenient "one-stop shop" for EB-5 benefits.

30.     AIIG also affirmed to Vietnamese investors in the GBR Project and others the means by which they could move money for investment in the Project from Vietnam to the United States, given the complex money transfer restrictions imposed upon Vietnamese citizens.   As is commonly done in Vietnam, those who wish to move large sums of currency abroad utilize the services of money exchange services that gather the assets of their customers together to facilitate financial transactions that ultimately realize their objectives outside of Vietnam.

31.     One of the threshold considerations USCIS utilizes in approving an EB-5 petition is for an investor to demonstrate their "source of funds," meaning that the funds utilized for the EB-5 investments were obtained from lawful sources and could be tracked dime-by-dime.  AIIG knew or should have known of such requirements given its past experience in EB-5 investments and communicated with Plaintiffs and others accordingly.  Instead, AIIG inexplicably induced

Plaintiffs into using money exchange services in Vietnam that could not track funds dime-by-dime but instead commingled the funds of investors with that of others, thus preventing a dime-by-dime tracing as expected by USCIS.

32.     Based on the marketing materials, the written strategy for the return of funds and other affirmative representations about the GBR Project, between August 2016 and 2017, each Plaintiff paid (a) a $500,000 Capital Contribution to GBR in exchange for preferred equity, (b) between $25,000 - $50,000 in administrative fees to MDRC and (c) retainers of at least $25,000 to AIIG for immigration law services.  Notwithstanding the irreconcilable conflicts of interest among the defendants, the Escrow Bank released the funds of Plaintiffs to the GBR Project.

33.     Shortly thereafter, upon investments made by the Plaintiffs, AIIG prepared Form I-526s for Plaintiffs to begin their first stage of the EB-5 petition process.

34.     Thereafter, the Plaintiffs received periodic updates on the actual progress of the GBR Project from Lubin as an attorney of AIIG.  These written updates were generally positive and offered glowing reports to lead a reasonable person to believe that revenue would soon be flowing.  However, the 2018 balance sheets for the GBR Project depicted a different story, showing only $6 million in EB-5 equity, or a 20% drop in value before it even began operations.

35.     In addition, Sandy Springs Bankcorp, the predecessor to Atlantic Union, completed its purchase of WashingtonFirst on or about January 1, 2018.  Plaintiffs were not made aware of this change by the Lubin Parties and were unaware of who and how fund escrow matters were being handled.

36.     The idea that operations of the GBR Project would repay investors became less of a reality in 2018, again due to the irreconcilable conflicts of interest created by the multiple hats worn by the Lubin Parties.  The 2018 Update Deck disclosed for the first time that a $10 million

bank loan necessary for the completion of the GBR Project would require the bank to have a first deed on its primary revenue generator - a Holiday Inn. See *Exhibit "1,"* supra. Again, the failure to disclose this material change in circumstances by the Lubin Parties to Plaintiffs was because Lubin feared a "run" of redemption requests by investors to the GBR Project, both of whom he represented.

37.    In July 2019, Defendant Ruby left AIIG.

38.    Nonetheless, the updates on the progress of the GBR Project continued until July 2024. It was then that USCIS began sending Notices of Intent to Deny (NOIDs) on I-526s of Plaintiffs and other EB-5 investors based on, among other things, issues regarding the use of money exchange services abroad who could not account for investor funds dime-for-dime. Once the I-526s of an investor in the Project was denied, the Project was obligated to refund that investor's money to them.

39.    Unbeknownst and undisclosed to Plaintiffs before July 2024, Lubin and AIIG were already facing similar issues with Vietnamese clients invested in other projects under the MDRC umbrella. And unbeknownst and undisclosed to Plaintiffs, MDRC, AIIG and the GBR Project did not have liquid cash available to pay the nationally recognized immigration law firm (Kurzban) they themselves used for appeals to USCIS. Kurzban's lawsuit to recover legal fees due and owing from AIIG is annexed hereto as *Exhibit "6."* Again, the irreconcilable conflicts among the Lubin Parties prevented full and fair disclosure of these material facts to Plaintiffs and other EB-5 investors in the GBR Project.

40.    The importance of the inability of the Lubin Parties to pay even small fees for legal expenses cannot be overstated given representations to honor redemption and refund requests of investments in the hundreds of thousands of dollars. The reality was that cost overruns in

construction and mismanagement by Lubin exacerbated by revenue challenges created by the COVID-19 pandemic, placed the GBR Project in a cash squeeze.  Compounding matters further was the promise by GBR in its offering documents to refund investor monies within 15 days of demand.  See ***Exhibit "3,"*** supra at ¶ 11.

41.    In July 2024 and the following months thereafter, Plaintiffs and other investors undertook steps to receive the promised refunds of their $500,000 investments in the GBR Project.  Much to their collective surprise, AIIG and Lubin's communications became erratic.  Many investors were at first offered excuses and false assurances by Lubin that they would be repaid in a matter of weeks or months.

42.    After ghosting Plaintiffs and other investors for weeks, Lubin engaged himself in the most irreconcilable conflict of all.  Lubin sent proposed agreements to Plaintiffs and other investors in late 2024 and early 2025 that (a) provided the payment of investor funds over time (b) on the condition that the Plaintiffs release the Lubin Parties from all liabilities.  See ***Exhibit "7"*** (hereinafter the "GBR Release").   Upon review by counsel, Plaintiffs learned that not only was the release sought by AIIG and Lubin not permitted under Rules of Professional Conduct of the Commonwealth of Virginia, but in fact it affirmed and validated the conflicted dominion and control of Lubin over the GBR Project itself that was undisclosed for several years.

43.    But even the Release in its improper and unenforceable form was not completely forthcoming in disclosure.  Lubin and AIIG failed to disclose to Plaintiffs that they had already obtained Releases from investors in other projects under the MDRC umbrella and that those other projects had defaulted on their repayment obligations.

44.    Since delivery of the Release to Plaintiffs, virtually all communications between them and AIIG and Lubin have ceased, despite repeated requests for status updates on the Project and their investments.

45.    Upon information and belief, the delay in communication and the repeated lies bought Lubin and the Lubin Entities crucial time in soliciting other MDRC investments from other unsuspecting participants unaware of MDRC's dismal track-record with GBR and its other projects that failed to repay their respective EB-5 investors on a timely basis, if at all.

46.    Plaintiffs do not know with certainty as to what cash flow from what source is intended to honor the terms of the Release.  Plaintiffs do not know with whom the Lubin Parties bank following the acquisition of WashingtonFirst by First Atlantic.  Plaintiffs are unaware of actual or inherent risks in the acceptance of such funds from such sources.  Plaintiffs likewise wish to hold GBR and others accountable to provide what was promised to them without excusing the irreconcilable conflicts of interest that tainted the GBR Project from the start.

## CAUSES OF ACTION

## COUNT I:  RESCISSION UNDER VIRGINIA CONTRACT LAW

47.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

48.    To the extent necessary, this cause of action is pled in the alternative.

49.    The laws of the Commonwealth of Virginia provide that each and every contract made in contravention of the conflict-of-interest provisions of Rule 1.8 of Virginia's Rules of Professional Conduct are illegal or voidable at the will of the client, and thus rescindable.

50.    The contracts signed by each Plaintiff in connection with their (a) retention of AIIG, (b) payment of administrative fees to MDRC and (c) investments in the GBR Project are contracts

that fall within the ambit of Rule 1.8. The conflicts of interests caused by instances of common control, ownership, legal representation of the Lubin Parties and legal representation of Plaintiffs are non-waivable as a matter of law.

51.     Thus, each and every contract in connection with Plaintiffs' investment in the GBR Project, the payment of funds to MDRC and the retention of AIIG is void for illegality, thus subject to rescission under the laws of the Commonwealth of Virginia.

## COUNT II:  RESCISSION UNDER § 29 OF THE SECURITIES EXCHANGE ACT OF 1934

52.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

53.     To the extent necessary, this cause of action is pled in the alternative.

54.     Section 29(b) of the Securities Exchange Act of 1934 ("1934 Act") provides for the rescission of contracts that violate federal securities laws.

55.     Each of the actions by AIIG and Lubin on behalf of GBR to conceal, minimize and misrepresent irreconcilable conflicts of interest, including the pursuit of waivers and releases for such conduct, were made with scienter by AIIG and Lubin in connection with the purchase or sale of a security.  Plaintiffs reasonably relied on such misrepresentations to their detriment.  Each of the aforementioned actions by AIIG and Lubin is a form of securities fraud under Rule 10b-5 and Section 20(a) of the 1934 Act.

56.     Thus, each and every contract in connection with Plaintiffs' investment in the GBR Project, the payment of funds to MDRC and the retention of AIIG is subject to rescission under Section 29 of the 1934 Act.

## COUNT III:  BREACH OF FIDUCIARY DUTY

14

**(By Plaintiffs Against Lubin Parties)**

57.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

58.     To the extent necessary, this cause of action is pled in the alternative.

59.     The Lubin Parties had fiduciary duties to Plaintiffs as co-general partners, principals, control persons, officers, directors and attorneys to manage Plaintiffs' investments with reasonable diligence, in good faith, and in accordance with representations it made to Plaintiffs regarding the partnership's intended business and purpose as articulated in the Partnership Agreement. The Lubin Parties also owed Plaintiffs a duty of care, loyalty, and not to engage in corporate waste, conduct that involved conflicts of interest or self-dealing, and to act in good faith and exercise loyalty to Plaintiffs.

60.     The Lubin Parties breached their fiduciary duties to Plaintiffs by fostering, justifying, concealing and minimizing irreconcilable conflicts of interest between one another caused by common control, ownership and legal representation.  These breaches by each of the Lubin Parties were specially known to them due to the involvement of AIIG, Lubin and Ruby and their obligations to comply with Virginia Rules of Professional Conduct for attorneys, none of which would be within the ambit of common knowledge of immigrant investors from Vietnam. Only when the Lubin Parties sought to disclaim the conflicts they concealed and minimized for years, did Plaintiffs know that the true nature of these conflicts had never been disclosed.

61.     The Lubin Parties participated in the wrongs personally and/or authorized and/or directed them.

62.     Plaintiffs have been harmed by the Lubin Parties' breaches of their fiduciary duties in an amount no less than $8.25 million. Such breaches constitute a material adverse effect on the

Partnership.

63.     In addition to the monetary damages that the Plaintiffs have suffered, the acts of the Lubin Parties were wrongful, dishonest, malicious, and oppressive, and the Plaintiffs seek an award of punitive damages in an amount to punish each of the Defendants and to make an example to others that such conduct should not be awarded, in an amount to be proven at the time of trial.

### COUNT IV:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
#### (By Plaintiffs Against Defendant WashingtonFirst/Atlantic Union)

64.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

65.     To the extent necessary, this cause of action is pled in the alternative.

66.     As specifically described above, the Lubin Parties breached their fiduciary duties owed to Plaintiffs.

67.     The Escrow Bank had knowledge that breaches of fiduciary duty would be committed upon Plaintiffs by virtue of their own due diligence review of the offering documents for the GBR Project and the illegal waivers of conflicts contained within them.  Any reasonable banking institution would have realized that the Lubin Parties sought waivers of conflicts that could not be waived under the laws of the Commonwealth of Virginia.  The Escrow Bank did nothing.

68.     In fact, the Escrow Bank knew of illegal waivers of conflicts in other EB-5 projects in which Lubin played the same or similar roles as in the Project.  Notwithstanding this knowledge, the Escrow Bank did nothing.

69.     Thus, the Escrow Bank knowingly aided and abetted breaches of fiduciary duties owed to Plaintiffs.  The Escrow Bank knew or should have known not to sit back idly when facing a business deal with non-waivable conflicts of interest that render contractual obligations

unenforceable.

70.    Such aiding and abetting was carried out for the Escrow Bank's own financial advantage, given its lengthy relationship with AIIG and Lubin.

71.    Plaintiffs were damaged by the actions of the Escrow Bank in the form their investments in the GBR Project and fees associated with it, which presently are at least $8.25 million.

## COUNT V:  VIOLATION OF VA. CODE §§ 18.2-499 and -500
### (By Plaintiffs Against all Defendants)

72.    Plaintiffs incorporate the allegations of all prior paragraphs as if fully restated herein.

73.    Defendants have intentionally, purposefully, and without legal justification, conspired, combined, agreed, and mutually undertaken with each other and other parties to perform the acts recited in this Complaint for the purpose of willfully and maliciously injuring Plaintiffs in their trade, business and property.

74.    Defendants, in devising, participating in and executing this conspiracy, have acted in bad faith, and engaged in fraudulent and willful misconduct.

75.    The Lubin Parties each had an independent personal financial stake in the conspiracy to dispossess Plaintiffs of their respective investments in the Project and to deliberately neglect their obligations to complete the Project in order to enrich themselves at Plaintiffs' expense.

76.    As a result of Defendants' misconduct, unlawful acts and the conspiracy launched against them as a consequence, Plaintiffs are entitled to actual damages, treble damages, interest, and attorneys' fees and costs as permitted by Virginia law.

## COUNT VI:  CIVIL CONSPIRACY
### (By Plaintiffs Against All Defendants)

77.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

78.     To the extent necessary, this cause of action is pled in the alternative.

79.     Each of the Defendants conspired with one another to assist AIIG and Lubin in breaching fiduciary duties owed to Plaintiff by committing one or more overt acts pursuant to a common design. Each of the Defendants were united by a common interest in hiding their wrongful conduct in failing to act upon the irreconcilable conflicts of interest caused by the simultaneous, common control, ownership and legal representation of AIIG, Lubin and Ruby of GBR, MDRC, RLP and investors in the GBR Project.

80.     Defendants, in furtherance of the common design, committed one or more overt acts to conceal their knowledge of these irreconcilable conflicts of interests, so much so that distributions from the GBR Project have been made dependent upon Plaintiffs' release of the Lubin Parties from all liability.

81.     Each of the aforementioned acts are wrongful acts designed to deprive Plaintiffs of their legal rights to seek intervention and protect their interests in the GBR Project, and thus their investment funds, and to conceal malpractice of AIIG and Lubin. There was a meeting of the minds between and among Defendants to commit the unlawful acts alleged herein.

82.     Plaintiffs have been damaged in an amount not less than $8.25 million, as a direct and proximate result of the conspiracy.

## COUNT VII:  VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT
### (By Plaintiffs Against All Defendants)

83.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

84. To the extent necessary, this cause of action is pled in the alternative.

85. Each of the Plaintiffs is a consumer as defined within the Virginia Consumer Protection Act ("VCPA") as Defendants were directly or ultimately engaged to assist them in the acquisition of immigration benefits.

86. Each of the Defendants committed acts of unlawful, unfair, or fraudulent business acts or practices and unfair, deceptive, untrue, or misleading advertising, as encompassed by the relevant provisions of the VCPA.

87. As set for in detail above, Defendants have engaged in a course of conduct that systematically violated the fiduciary duties owed to the limited partner Plaintiffs and subsequently conspired to conceal their misconduct from Plaintiffs.

88. Defendants Lubin and Ruby are duly licensed to practice in the Commonwealth of Virginia. Thus, they and AIIG are subject to the Virginia Rules of Professional Conduct.

89. Rule 1.8 of the Virgina Rules of Professional Conduct prohibits the involvement of members of the bar in transactions and engagements which result in irreconcilable, non-waivable conflicts of interest.

90. Each and all of the Defendants named herein have engaged in unlawful, unfair or fraudulent business act or practices by breaching fiduciary duties to Plaintiffs, aiding and abetting, and conspiring to breach fiduciary duties (and subsequently concealing the breach) and violating the applicable rules of professional conduct through such actions,

91. The harm to Plaintiffs far outweighs the utility of Defendants' policies and practices. Defendants and each of their policies and practices are further immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and, therefore, against public policy.

92.    Defendants' policies and practices consequently constitute violations of the VCPA.

93.    Defendants' deceptive policies and practices as set forth above deceived Plaintiffs as well as other EB-5 investors to invest in the GBR Project.

94.    Defendants and each of them have engaged in, and continue to engage in, the same scheme of deceptive acts and practices of a fraudulent nature. Defendants' unlawful, unfair, and/or fraudulent business practices thus present a continuing threat in that all the Defendants will continue utilizing similar immoral and deceptive policies and practices in the conduct of their businesses.

95.    Plaintiffs have suffered monetary losses and injuries in the total amount of at least $8.25 million, not including accrued interest, as a direct result or consequence of Defendants' illegal conduct and illicit actions.

96.    Furthermore, the illicit business acts or practices of Defendants named herein were (1) fraudulent; (2) malicious and carried out with a willful and conscious disregard for the rights of Plaintiffs; and/or (3) entirely oppressive in nature and carried out with the intention of depriving Plaintiffs of their substantial rights and significant monies invested. The business acts or practices of Defendants and each of them were all carried out and performed with full knowledge of their wrongful and illicit nature.

97.    As such, in accordance with the VCPA, Plaintiffs are properly and legally entitled to an additional award of punitive damages in a sufficient amount, to punish and to make an example of the Defendants named herein so as to deter such fraudulent, oppressive, and malicious misconduct in the future in a total amount according to proof at the time of trial.

## COUNT VIII:  LEGAL MALPRACTICE
### (By Plaintiffs Against AIIG and Lubin)

98.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

99.     To the extent necessary, this cause of action is pled in the alternative.

100.    Lubin and thus AIIG knew as a matter of fact that representation, ownership and/or control over the component companies of the GBR Project, along with simultaneous representation of investors, presented irreconcilable conflicts of interest in the formation, management and operation of the GBR Project.

101.    In addition, AIIG and Lubin failed to counsel Plaintiffs and others properly as to the use of money exchange services in Vietnam that they knew or should have known would not meet muster with the "source of funds" review of I-526 petitions sent to USCIS.

102.    The conduct of AIIG and Lubin in these instances constitutes legal malpractice for which Plaintiffs may seek relief from this Court, as such malpractice was and continues to be the direct and proximate cause of the damages to Plaintiffs.

## COUNT IX: MONEY HAD AND RECEIVED
### (By Plaintiffs Against AIIG, MDRC and GBR)

103.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth herein.

104.    To the extent necessary, this cause of action is pled in the alternative.

105.    Money received erroneously must be returned to its rightful owner where it is unjust for the recipient of the money to retain it.

106.    All funds delivered by Plaintiffs to AIIG, MDRC and GBR were erroneously received, as the irreconcilable conflicts of interest of Defendants rendered the agreements under

which such payments were made void as a matter of law.  Those agreements include (a) all

engagement letters between each of the Plaintiffs and AIIG, (b) the subscription agreements

between each of the Plaintiffs and GBR and (c) agreements for administrative fees between each

of the Plaintiffs and MDRC.

107.    Given the foregoing, Plaintiffs' funds must be returned to them by their respective

recipients with interest or a market rate of return.

108.    Moreover, because the money was improperly or fraudulently used to fund the

doomed GBR Project or pay for services unrelated to the intended purpose of Plaintiffs' EB-5

investments or for other fraudulent conveyances, the law imposes a constructive trust upon any

assets purchased with Plaintiffs' investments.

109.    Because Lubin obtained funds from Plaintiffs that were invested in and are directly

traceable to the GBR Project, a constructive trust should be imposed on all assets of GBR until

Plaintiffs are repaid.  To the extent their funds were not invested in construction of the GBR

Project, a constructive trust should be imposed on AIIG and MDRC and Lubin personally, as well

as any entity or person to whom they transferred Plaintiffs' funds.

110.    Imposition of a constructive trust is the only means available to prevent AIIG,

Lubin, MDRC and GBR from working a fraud or injustice on Plaintiffs and being unjustly enriched

by the improper transfers of Plaintiffs' significant monetary investments.

## COUNT X:  ACCOUNTING

111.    Plaintiffs incorporate by reference the allegations contained in the foregoing

paragraphs as if set forth herein.

112.    The Offering Documents and their subscription documents constitute invalid and

unenforceable contracts that require rescission.

113.    Pursuant to those contracts, Plaintiffs each invested $500,000 + administrative fees to invest in the GBR Project.

114.    The relationships between Defendants involve extensive and complicated accounts as they are affiliates and confederates of one another and share common executives and share control over one another.

115.    An accounting is necessary to determine the financial condition and transactions of Plaintiffs' investments into the GBR Project.

**THIS MATTER REQUIRES THE IMMEDIATE APPOINTMENT OF A RECEIVER**

116.    The irreparable and ongoing harm caused by mismanagement of both GBR the entity and the GBR Project caused by the Lubin Entities' irreconcilable conflicts render its operation as currently constituted impractical, if not legally questionable.  Accordingly, Plaintiffs respectfully request that GBR be placed in receivership by the Court under the management and oversight of a receiver who is not burdened with the irreconcilable conflicts that have adversely affected, and continue to adversely affect the Project.

**DEMAND FOR JURY**

117.    Plaintiffs demand a jury trial for determination as to all causes of action as herein alleged.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment against the Defendants as follows:

1.    Rescission of each of their $500,000 investments from GBR as provided under Virginia common law and/or federal securities laws; or

2.      In the alternative, judgment against the Defendants for compensatory damages in an amount no less than $8.25 million, which includes;

      a.  Return of their administrative fees paid to MDRC; and,

      b.  Return of all legal fees paid to AIIG;

3.      Imposition of a constructive trust on all assets or property owned or controlled by GBR and MDRC or transferred by GBR or MDRC; and

4.      A judgment in favor of Plaintiffs and against Defendants for their costs of suit incurred herein; and,

5.      A judgment in favor of Plaintiffs and against Defendants for any and all prejudgment interest, post judgment interest according to proof; and,

6.      A judgment awarding punitive damages to Plaintiffs and against Defendants as permitted by the laws of the Commonwealth of Virginia in an amount to be determined according to proof at trial; and,

7.      For an accounting; and,

8.      The immediate appointment of a Receiver over GBR; and,

9.      For such other and further relief as the Court deems just and proper.


Dated: July 22, 2025.

                              Respectfully Submitted,

                              Plaintiffs By Counsel

IMPRESA LEGAL GROUP

 /s/ George E. Kostel
George E. Kostel, Esq. (VSB # 34757)
Richard K. Kelsey, Esq. (VSB # 44232)
Impresa Legal Group
3033 Wilson Blvd., Suite 700
Arlington, VA 22201
Tel: (703) 842-0660
Email:  georgekostel@impresalegal.com
Email:  richkelsey@impresalegal.com


LAW OFFICES OF ROBERT V. CORNISH, JR., P.C.

/s/ Robert V. Cornish, Jr.
Robert V. Cornish, Jr.  *Pro Hac Vice (to be filed)*
680 South Cache Street, Suite 100
P.O. Box 12200
Jackson, WY 83001
Email: rcornish@rcornishlaw.com
Tel: (307) 264-0535
*Counsel for Plaintiffs*